Case No. 25-1378. Thank you. Good afternoon. Good afternoon. May it please the Court, Judge Lohier, Judge Jacobs, Judge Cabranes. I'm Allie Garmin-Chardon, and I am here on behalf of Plaintiff Isamide Asinga, and I'm also here with him. He is in the courtroom as well today. The District Court improperly dismissed his claims on Rule 12b-6, and you should reverse. Because six claims were dismissed, there's a lot that is covered in our briefs, and I don't think there will be time to address it all today, unless the Court prefers otherwise. I intend to primarily focus on two issues. The first, Isam Asinga was physically injured by distribution and ingestion of a contaminated substance. What is the nature of the injury? What is the nature of the physical harm? Sure, Your Honor. It is a classic and quintessential bodily invasion tort. The physical harm was ingesting a substance, a drug, he didn't want to take. We should not do what the District Court did and confuse the harm with the losses. If I take Aleve as opposed to Motrin, and I don't want to take Motrin, but it doesn't do anything to my body, it doesn't harm me, that's a psychological harm maybe, but where's the physical harm? Well, you're right, first of all, Your Honor, and the truth is the same. If I had taken a contaminated Gatorade, Cartarine supplement, I would have a very different loss and injury than I, too, would have a bodily integrity invasion, a drug I didn't want to take. My losses would be different. But, as they say, de minimis non curat lex, you and I wouldn't have the same injury that Issam does. Our complaints... But his injury, and this is really a question, is about eligibility. That's a type of his loss. The regulatory ban confirms an injury that already happened, Your Honor, and the injury was ingesting a substance. This is not a medical monitoring case, and I have shied away from that in some ways in the briefing, because this isn't a case about a potential risk of future harm that might happen. This is, plain and simple, a harm that already befell him. As we explain and allege, the moment he ingested this substance, his body underwent physical, chemical changes by metabolizing it. It became present and poisoned his blood and organs. In Benoit v. St. Gobain, just five years ago, this Court affirmed that allegations of the physical manifestation or clinically demonstrable presence of toxins in the plaintiff's body are sufficient to ground a claim for personal injury, even without symptoms of a disease. In other words, the measurable accumulation of a potentially harmful toxin in the absence of symptoms of a disease, and then, of course, in the absence of a disease. But you're calling it a harmful toxin, and for almost anybody on earth, it wouldn't be harmful to have a trace amount of something that is performance enhancing. Sure, Your Honor. First, I mean, this is... Is this where your client is uniquely vulnerable to this trace amount of a contaminant? Yes, Your Honor. In a sense, I am. And the eggshell deals with damages. What damages? Once an injury is recognized, and we've decided under rules of proximate causation that it's reasonably foreseeable, the eggshell plaintiff rule does recognize that whatever damages truly flow to that plaintiff are compensable. And so, in a sense, you are right, Your Honor. E. samasinga was among an elite group of people for whom this injury was much greater than it would have been for you and I. And there can be no argument, to be clear. There need be no discussion as to whether that was foreseeable. It's significant that Gatorade, Pepsi, understood that specific risk when it marketed this supplement. Why? It paid for an additional certification, the NSF certified for sport, that was only for people like him. Because, again, you and I could take this drug and go running my local 5K, and nobody would know. But E. sam is different, right? And for him and an elite group of athletes, they know that the ingredients which are listed on a bottle, it's not enough because contamination happens. And, you know, there are a lot of, there really isn't an issue of choice of law. It has been opposition below, and it is here. There's no conflict. But should you have any concerns, this is the same throughout, you know, both in New York and in the law under the states whose law would apply, which is Florida and Texas. In American Optical versus SPIWAC, 2011, the Florida Supreme Court affirmed that under Florida's common law, plaintiffs who suffers an unwanted bodily invasion, in that case, ingestion of asbestos fibers, suffers an injury even without accompanying SPIWAC versus, excuse me, American Optical versus SPIWAC, Your Honor. And it's in a brief. If you'd like the citation, I'm happy to provide it. That case involves asbestosis. And whether, you know, what are the vested rights under the common law of Florida prior to the Florida legislature stepping in and changing them to require, in asbestos cases, manifestation of malignancy. And the court couldn't have been any clearer. Sure, it wasn't a challenge to the legislation, but it's a question of whether, what were the vested rights prior to it. And it made very clear, and I quote, Florida common law does not and has never required an impairment or particular manifestation of an injury to some arbitrarily adopted level before a cause of action accrues. What are the data? How do you distinguish this between the case of somebody who has a dietary preference as a vegan, for example. Sure. Or a person who observes religious dietary rules. They eat something, it's nourishing. It's even good, very tasty. But it's a preference not to eat it and maybe even to be horrified. How do you distinguish those cases? How can we rule in your favor without opening the door to everybody's preferences about what they want to eat? Your Honor, that's a great question. And I actually almost wish I'd made that analogy. I think the law does protect the, let's talk about the religious person who can't eat beef and eats the Burger King fries that were coated in beef grease, right? That's an injury that American law would recognize, right? In the restatement, some of the sections that we cite talk about this specifically. The whole point of tort law is it's not a one-size-fits-all. The question, the primary question is what is an injury? And our law recognizes our right to bodily integrity, what we ingest. What the damages are are going to be different for everyone. And so there's an example from the restatement that I cite about the wart being removed from the patient's neck. Is it a restatement? It is. Yes. The restatement second, section 15. It's in my reply. I went ahead and quoted the whole thing. Because it just goes for this age-old principle that we decide how we're harmed. So in the restatement, a surgeon, a patient has a wart, doesn't want the wart removed, says, doctor, don't remove the wart. The doctor puts the patient under for something else that's needed, that's consented to surgery, and doctor removes the wart. And that's an injury to the plaintiff. Okay? Now, what should the plaintiff, you know, what are the damages and how much? They might be none. They might be none. But you're saying that there is an injury. But it was by your standards, Your Honor, or by my standards, subjectively it was a good thing. Right? You know, a chicken sandwich is nourishing. But for a vegan, I don't think we should go into the vegan thing, Your Honor, or to, you know, any one of these food cases. But it's an interesting point that we do recognize this. And it's a question of what the damages are. And what the lower court did was confuse injury with damages. Sure. Isamah de la Cinca doesn't have medical bills like you have in many personal injury cases. Right? And he is not seeking, but he's far beyond a medical monitoring case where he's seeking future injuries. He says, this physical adverse physiological change, right, led me to all sorts of bad consequences, as proven, as established by a regulatory failure. And I lost, you know, I have lost wages. Even Gatorade in their brief accepts that physiological changes are an injury. And the question is only whether they were adverse. And, yes, they were adverse here. Isamah does not want to ingest this illegal substance. He doesn't want to have it in his blood. And Gatorade, in fact, suggests in its briefs that, well, heck, he beat a world record. He beat Noah Lyles while this trace contamination. So, I'm sorry. I'm just trying to differentiate some things. So you said he does not want this ingested. He didn't want this product to be in his body. Yes. Yes, Your Honor. And is that the harm? That is a harm under tort law, yeah. The bodily invasion, I mean, that is the initial injury. And then the question is, is it harmful? Yes, it was harmful because it became, it accumulated in a measurable, in a measurable way. Just like in Benoît. Tell me with a little bit more precision, and maybe this is not in the complaint. How did it harm his body? Sure. You know, Your Honor, it is in the complaint. We have lots of allegations of injury. But it was metabolized by his system. We put in the medical definition of metabolism in our brief. How is that a harm? It's harmful. Again, Your Honor, the harm is because he was invaded by a poisonous substance. It doesn't mean that he doesn't have to have developed cancer today. If this were the test, Your Honor, a person who has a sign of a disease would not have an injury because they don't have a symptom. So a breast cancer lump. You're not claiming that he is going to suffer some injury in the future. No. What you're claiming is that this rendered him ineligible to compete, right? Yes, Your Honor. So, and what I'm trying to assume with cancer, we're not talking about that. We're talking about what is the actual physical harm to his body, separate and apart from eligibility issues? Well, if you want to look at it like this Court said in Benoit v. St. Gabin, it is the measurable accumulation of a potentially harmful toxin even without symptoms of a disease. In his case, there was the disease itself to be analogous. There was the harm. The harm was carrying carterine in his body. That is harmful. That mere fact is very harmful to him. And, Your Honor, all of these... Harmful to him because of, and I'm sympathetic, but, you know, as I like to say, don't talk to me about this case, talk to me about the next case where some person is going to say I ate broccoli and I was physically harmed and then we're stuck with a single, we're stuck with this. Yeah. What do we say in this case? So it seems to me to be harmful purely by reference to his ineligibility. I don't think so, Your Honor. I think the fact that Esam is so, this case is unique, right? This case is very, it is, you know, although... Everyone who stands at that podium says this case is unique, don't worry. No, but, Your Honor, there's a test and Esam meets the test. The clinically measurable presence of this in his blood. And that's this Court's test, okay? And he, and the questions that surround, this is not, it would be radical for you to find he doesn't have a tort. Since 1266, manufacturers of food supplements have had heightened duties to make sure that the food that they distribute, regardless of privity, you know, regardless of warranty theories, that the food they distribute is safe for human consumption. And that is the violation we have here, okay? The fact is the broccoli example, right? Or the person, those, that person still, there are still rules, right? There still needs to be a measurable demonstration of harm. And there are, there is here. We have certified lab, we've got a very well-established testing process that randomly took Mr. Asinga's urine and sent it to accredited labs where these tests were confirmed. And we have the lab results. We have, and they were verified. And those scientists, if we have the chance to discover and prove our claims in this Court, those scientists can come in and testify that this was demonstrably present in his blood. Could you address the, your breach of contract? Yes. Interference with contract. I take it that you're talking about two contracts. Yes. One is the scholarship, and the other one is his undertaking not to dope. Actually, yes, Your Honor. So one is the contract, yes. The same contractual provision in both, right? I will keep my body free of banned substances. Yeah. Right? A very simple contractual promise, but that does, but that no less contract does it make. So under. How did Gatorade willfully and intentionally interfere? I don't think it's possible to say that in order to defeat his eligibility somebody put an eyedropper and adulterated this product. There's nothing intentional about that. You're right, Your Honor. What is the intentional and willful interference in contract? Absolutely, Your Honor. We are not saying it intentionally. We're saying it was responsible for the initial breach, but not that it intentionally did that. This is a weird case. This is why we have to show for interference.  And we've alleged it. So what we've alleged is this, Your Honor. And so you don't, you do not need another case's site. In particular, take a look at the Texas cases, Tippett v. Hart, Fawcett v. Santos. Without reference to cases, I mean. Sure. There aren't going to be many cases that support your position. This is an oddball case. Thank you, Your Honor. Could you please tell Judge Lohier that? What makes it willful and intentional? Sure, Your Honor. So the, here is what is significant. We are not alleging the initial breach. In this case, there was a period of six months. So the interference. You're saying you're not alleging the initial breach, meaning supplying. Supplying, yeah. That's a tort claim. Adulterated product. Right. That is a product liability claim. Okay. There was a personal connection to Mr. Asinga's case. Okay. This is why. First of all, recognize that in Texas and elsewhere, interference that includes prolonging a breach, making compliance impossible, not just inducing it, making it more burdensome or difficult to comply, is tortious interference. In this case, Gatorade, again, an unusual case. Esom was given these supplements directly from Gatorade, and he had his own contact there. Right. When it became clear that he had been charged with this offense and had submitted a whole host of substances and the Gatorade had come back clear, they began, excuse me, the Gatorade recovery governments were the only ones that had tested positive. He began looking for a sealed supplement bottle, which Gatorade, by FDA regulations, was obligated to maintain. Is that under federal regulation? It is, Your Honor, and it is cited in our brief. For the purpose, for this purpose, to confirm purity and quality. Gatorade says, we don't have it. And so it's in September that he first has permission to look for and test this. If they're required to have it, to maintain it, for each, not batch, but each lot. Yeah. Is there an available inference if they don't have it? There is, because it turned up. It turned up late. It turned up too late to help him. So, Your Honor, it's a strange case. So it turned up and then it was negative because of time passing? Yes, yes. So by the time it turned up, when it turned up, they found it after Esam had been banned. Okay? And at that point, miraculously, and the NS... Is that because of a half-life, whether it was... Yeah, well, that, exactly. We proved that because we had his original supplement, which had tested positive. And no longer tests positive. And it's no longer positive. And so we say this. We say they did, the proof is in the pudding. They had it. They had exclusive control over it. It was missing from September until May. No, excuse me, June. And it turns up in June. And it turns up too late. Okay? During that time period, there was a whole... And they were being asked directly by the Athletics Integrity Unit. And they were saying, we don't have it. But guess what? We got something else. It happens to be the batch that was tested. Take this. Take our assurance that it's the same thing. If they had turned over a sealed supplement bottle and given him access when he needed it, he could have met that gold standard and cleared his name. So that's your willful and intentional interference in contract claim? Yes. Your Honor, I have never seen a product liability case with any kind of direct intentional tort. And this is it. No. Okay. So you reserve some time for rebuttal. Thank you. Thank you. Good afternoon, Your Honors. And may it please the Court, Jessica Ellsworth for the Gatorade Company. The District Court here correctly determined that none of the causes of action in the amended complaint stated a claim. The product liability claims failed under the economic loss doctrine because they seek to recover for economic losses from a failed drug screen and not for a physical injury. I'd like to focus on that first and then I'm happy to answer any questions about the tortious interference claim as well. The appellant does not allege that he suffered any physical harm from the trace contamination that he says was in some of the gummies that he ingested over a very short period of less than two weeks. And in fact, in his own allegations, the contamination was completely out of his system by just three days later. These product liability tort claims that he wants to pursue and that he alleged all require an injury to the person. And it's black letter law and has long been black letter law in New York that you need to have a physical injury. A preference not to eat something, Judge Jacobs, is not a physical injury. But case after case from this court, from the New York Court of Appeals, from the New York Appellate Division, from the lower courts in the circuit, all make very clear that a product liability claim has to be about a physical injury. Would you concede then though that whether you call it an injury or not, he suffered the ingestion of something that was adulterated and that caused him a physical, a detectable physical change? So, Your Honor, I agree that it was detectable on the drug screen. Yes, I think that is correct that in his allegation, the gummies were responsible for the failed drug screen. So, I take it on the eggshell skull theory, there could be something that is injurious to one person that's not injurious to anybody else. So, Your Honor, you would, that could be true and I think there are cases where someone has a physical injury because they are an eggshell plaintiff. So, for example, I ingest something, it has a different effect on me than it might have on you, I end up hospitalized, I have experienced a physical injury that someone else might not. But what you can't do is conflate the lack of physical injury with the failed drug screen. There are, and I think this is important because what the economic loss rule does is it tries to police this line between what is a tort claim, a product liability tort claim and what is a breach of contract or warranty claim. So, an argument that a product didn't live up to its expectations and caused some economic loss because it didn't live up to its expectations, that puts you squarely in the contract warranty side of the line in order to get onto the product liability tort side of the line. How do you explain the restatement wart? So, Your Honor, I think there are two important things about the restatement wart example. The first thing I would note is that that comment has never been adopted or cited as the law in New York or Florida or Texas to establish a physical... for any reason, but let alone to establish that it would show physical injury for a negligence or strict liability claim. And the second thing I'd point out is that it isn't even an analogy for a product defect claim. It might be for some other type of tort, like a battery. But it helps to explain, you know, these restatements, among other things, particularly the comments and commentary, help to explain concepts and to help concretize what we mean by, for example, harm. And here, the restatement... the commentary purports to explain what the restatement means when it describes harm. So that's what I'm... that's where my question is directed. So, Your Honor, I would direct the court to look at the Koronia case from the New York Court of Appeals in 2013. Where the court was very clear that to have a product liability tort claim under New York law, you must have an allegation of physical injury. Not just a... sort of... some sort of beneficial effect that you didn't want, which is perhaps the wart removal or having eaten broccoli, but you need to actually have a physical injury, a detriment to an individual's body. And that's why the case that has... For the record, I would view eating broccoli as a detriment to my body. But... that's my problem, not yours. I say it's finished. I think you and my 11-year-old have a lot in common in that regard. The Benoit case that my friend on the other side mentioned was an application by this court of Koronia. And I think it's important for this court to understand what was different in that case than in this one. Because, first of all, as I heard my friend say today and as she said on page 13 of her reply brief, the appellant isn't seeking medical monitoring. This isn't a claim in which there is some sort of future potential harm that this one-time drug screen has indicated may be present. So that is a very different situation than Benoit. And also, as the district court pointed out, there is no plausible allegation that the ingestion of carterine in the trace amounts... We're talking picograms, which I learned through this case is trillionths of a gram, that picograms of this substance for this tiny period of time... What difference would that make? Suppose it was a lot. Suppose it was a lot and enhanced his running on a given day. How does that help you? How does that help you that it's a small amount? I think it helps us that it's a small amount because there is no... There can be no allegation, and there is no allegation, that this small quantity could cause harm. There might be an allegation that if you had a very large quantity of a toxic substance, enough to create some sort of risk of future harm, that's, I think, what happened in Benoit, where there was elevated PFAS levels in individuals' blood. And the elevation was to such a point that there really was a risk of future harm. I understood your argument to be that it didn't cause harm because actually it was beneficial because he was faster than usual. Well, Your Honor, we think that underscores that there really is no plausible allegation of physical harm here, which is what New York law... But then again, if you do something that enhances your performance, it may not be good for you. I mean, a student who decides to cheat on an exam is probably going to do better. And yet if the student is expelled, ultimately that's not a good thing. It's not, Your Honor, but if it's an economic loss that results and there is not a physical injury, then I think New York law is very clear that there is no product liability tort claim. You may have other claims. You may have claims about warranties that were made to you. You may have claims about contracts. And even if you don't, as we cite in our brief at pages 31 to 32... But your position is there is no claim and there's no possible claim. Well, so they dropped their warranty claims. They didn't...were in their initial complaint. They chose not to pursue the warranty claims. And we cite a number of cases at pages 31 to 32 of our brief that talk about the fact that just because you don't have a valid contract or warranty claim for some other reason isn't a free pass to avoid the economic loss doctrine. That doctrine is well established in New York law. And I haven't heard the plaintiff, the appellant here, give any reason that this court could create some new fold exception that would fly in the face of what court after court has said when applying New York law. I would... What do you... Well, I'd be ready to turn to the contractor. Well... I want to say more. So you mentioned Benoit, which is a case of ours from a few years ago, and it seems to hinge on at least an allegation of an observable and measurable presence of a toxin, however you want to describe that in the blood. Now, it's not limited to a toxin necessarily. I mean, just analytically. And I think that the allegation here is that... is literally that there was an observable... He's just... he's quoting Benoit almost in the amended complaint. Observable and measurable presence of carotid in his body. Why isn't that enough? This is a pleading matter. So, Your Honor, I think it's not for two reasons. One is that Benoit is an application of carotid in this medical monitoring context. So I think you have to start with what carotid says, which is that if you don't have a physical injury, you do not have a product liability tort under New York law you can bring. And in Benoit, there were, I think, three key facts... But carotid is about future harm, not present harm. That's right. Medical monitoring, right? Yes. That's right. And so in Benoit, you had three key allegations from the plaintiffs. One was that they had an elevated PFOA level in their blood. Two was that this elevated level was associated with a serious health risk. And three was that the court said the buildup of this toxin in their blood could count as a personal injury such that they could seek medical monitoring. That was the entire... Because of the risk to their health. Right. Exactly. Because they had offered allegations about this elevated level being associated with serious... So if he had said... If he had alleged that Cardamon, the measurable presence of Cardamon in his body, contaminated his blood, just at the motion-to-dismiss stage, would that have not been enough? I think he would have had to say that it posed a serious health risk to him. He's not making a medical monitoring claim. He's talking about present harm. That is, the harm that was caused at the time that he ingested the gummies. So why wouldn't that be enough? And all... I'm very focused on the definition of harm under New York law. Right? Certainly, Your Honor. And I think the answer to that gets at the question Judge Jacobs asked to my friend on the other side, which was about whether a preference not to eat something can count as physical injury. Because if it is enough that there is a measurable amount of any substance in your body, whether it's Aleve, Motrin, broccoli, or picograms of carterin, if that is enough to show personal injury under New York law, we are in wholly uncharted territory that is inconsistent with the way I think New York courts have approached this. And there's a consistent line of cases we cite. So, I'm sorry, but if he had, in his amended complaint, referred to medical evidence that in fact his body had been transformed in some way or his organ had been actually transformed, would that have been enough to show harm? I think it would depend what the transformation was. Because obviously when you drink coffee, caffeine can increase your heart rate for a brief period of time. And if you wanted a decaf coffee and you got a caffeinated coffee and instead your heart rate is elevated for five minutes but nothing happens, I don't think that under... Well, if nothing happens, your heart rate is elevated for five minutes. Nothing, no detriment to your body happens. Unless, if you happen to be the outshell plaintiff that Judge Jacobs mentioned earlier and you have a heart attack in those five minutes, then it's a different situation. But we don't have that situation here. My friend describes this as being a physiological effect. And so if things like sweating in reaction to being afraid or having an increased heart rate in response to stress, I mean these sorts of physiological experience someone has that doesn't cause them any detrimental harm does not count as a physical injury under well-established New York law. I'm happy to address the contract claim if you would like, Judge Jacobs. I think on the contract claim there is no allegation that Gatorade intended to cause this individual to lose his scholarship. I understand your officer's argument. It's that Gatorade after the ingestion did not produce I think it's alleged deliberately to cover up did not produce the bottle that contained that corresponded to the not the batch but the lot. And therefore that could support an inference that it was deliberate. And if that is so there would be a deliberate act which could then be said on a pleading basis anyway to support the claim that they interfered with the plaintiff's scholarship. Your Honor, there are three things I would like to say in response to that question. The first is that the plaintiff hasn't identified any contractual obligation that he had to provide a bottle from this lot. It's simply he wanted I don't think they're talking about that. I think they're saying that the contract is with the school to provide tuition. I mean for an elite athlete that's extremely valuable. The question is did they interfere with that contract by deliberately failing for their own reasons to come forward with the particular lot sample that would have vindicated his claim. So, Your Honor, as I understand it the breach has already occurred at this point in time we're talking about. He has failed the drug screen. That is what he says with the violation of his contract with the World Anti-Doping Agency. What I hear is that the interference with the contract yes, he had the contract for the state of scholarship and the ingestion interfered with that. But that's not the intentional act that the plaintiff is claiming as I understand it. It's that there was an intentional failure to produce the little bottle that would have vindicated his claim and by failing to produce that even though Gatorade was required to maintain it there was a deliberate interference with the contract to get the scholarship. So, I hear Your Honor's question and I agree that there has to be an intentional act to interfere with a contract. The contract here was to remain drug free and to not fail a drug screen. So, Gatorade had to have  interfered with that contract. I don't think there's any allegation that it did so and I in fact heard her say today that nothing Gatorade did was intentional up to the time of the breach. So, then we want to talk about what happened. The loss of the  could only have been because he intentionally ingested this contaminant and the question becomes whether whether his ability the plaintiff's ability to to to to show that he did not intentionally ingest it was something that that Gatorade intentionally interfered with because and I'm just repeating the allegation of the complaint because Gatorade had a contaminant in the particular bin or batch or whatever it is and and didn't want it known. So your honor that brings me to the other two points that I wanted to make in response to your question. One is that is the complaint acknowledges Gatorade immediately turned over a sealed bottle from the same batch and it is important to know that a batch under FDA regulation is the same manufacturing run using the same ingredients. So they were   run using the same ingredients that's meant to be the same quality. There was not a  that was identified as coming from the same labeled lot until a later point in  That is true. But as the district court pointed out in order to have I think by then he would have lost his scholarship. I think that he lost his  when the anti-doping agency gave him the suspension as a result of the failed drug test. There's not anymore in the complaint there's no dates there's one of the shortcomings that the court noted. And lastly I'd say this notion that somehow an after the fact act could matter for purposes of this claim. The case that the plaintiffs have cited to you is this Texas case about cattle grazing. And I would encourage the court to look at that case because it is completely irrelevant to the allegations here setting aside that it's Texas law anyway it is irrelevant to the allegations that are here. Their claim is essentially that Gatorade should have tried harder to help him faster and that is not an intentional interference with contract claims. So for all of these reasons unless the court has further questions we would ask this court to affirm the district court's judgment below. Thank you very much. Is there a rebuttal? Yes, Your Honor, quickly. First there is these are huge factual questions that this court shouldn't have to be dealing with. But  versus lot extraordinarily large significance in terms of when they were  or what happens to them which is exactly why the NSF certification was lot by lot not batch by batch. When Gatorade turned over the batch the NSF certified lot was not immediate it was six months later and it goes to show just how much the AIU was hanging on Gatorade's word because it was the moment they got that bottle from a different lot that they actually formally finally charged him because to them based on Gatorade's representations it's  the same thing. Benoit versus Gobain I'm not sure what case counsel was talking about that is a product liability case. That is a case involving the manufacturer of an unsafe product and in fact in that case this medical monitoring this new cause of  doesn't exist. What exists is this age old recognition that this physical impact bodily invasion is a harm and in this case the appropriate damages are medical monitoring. To adopt what Gatorade advances would be to turn all of this on its head and I know our briefs cite more of a  than probably they should but the purpose of that is this it's to show this isn't asking the court to make a new rule or have to open new doors. This is age old stuff. The invasion of his body with something he didn't want to eat causing adverse changes is a recognized intort. And it is recognized in tort and well handled under these rules. In Wallace v.  out of Florida in Cavett v. Jetson a plaintiff saw a roach in the food she had been nauseous. So talk about sweaty palms. In Wallace v.  the plaintiff perceived maybe it was a condom in her coke bottle and maybe she might have  But in all of those cases   allege emotional distress. The difference between his and a stand-alone N.E.I.D.  is that he also has physical impact. In these cases as we explain in our case cited by Gatorade or anywhere involving ingestion and harmful changes of a physical substance where a plaintiff is not seeking to merely recoup what they spent on the substance that is barred by the economic loss doctrine. That is    said because of the way that plaintiff had  you don't have a personal injury. But down the road a new district judge is sitting and he said that the court acknowledged that ingestion of a substance that you don't want to take causing you to have it in your blood and failing a test is a personal injury from which economic loss as well.  presumed to be a  injury. And I think that  plaintiff was adamantly insistent and begged the court to find it wasn't a personal injury. But even in the face of that this court said look come on it's  a personal injury from which economic losses flowed. So to find otherwise would certainly be very inconsistent with that but it would overturn Benoit and it really would fly in the face of half of the binder and all of that says bodily invasion is a  injury. Thank you.